Leonard A. Bellavia, Esq. (lbellavia@dealerlaw.com)
Shaun M. Malone, Esq. (smalone@dealerlaw.com)
**Bellavia Blatt & Crossett, PC**
200 Old Country Road
Suite 400
Mineola, NY 11501
(516) 873-3000

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------- x
                                                     :

B&Z AUTO ENTERPRISES, LLC d/b/a        :
Riverdale Chrysler Jeep d/b/a Eastchester    :
Chrysler Jeep Dodge  d/b/a New York Cars Direct  :
d/b/a New York Autos Direct,                   :       Case No.:  15-cv-5905
                                                     :
                         Plaintiff,       :
    vs.                                           :
                                                       :
AUTOTRADER.COM, INC.,                  :
                                                       :
                      Defendant.     :
---------------------------------------------------------- x

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, B&Z Auto Enterprises, LLC d/b/a Riverdale Chrysler Jeep d/b/a Eastchester Chrysler Jeep Dodge  d/b/a New York Cars Direct and d/b/a New York Autos Direct (referred to as "Plaintiff" or "B&Z"), by its attorneys, Bellavia Blatt & Crossett, PC, as and for its Complaint against the Defendant, Autotrader.com, Inc., alleges as follows:

## BACKGROUND, NATURE OF THE ACTION AND THE RELIEF SOUGHT

This is a civil action for false advertising, fraud, negligent misrepresentation, unjust enrichment, unfair and deceptive trade practices under federal and state law, and violations of the

RICO Act against the Defendant, Autotrader.com, Inc. ("Defendant" or "Autotrader").

Autotrader is an online website that advertises new and used automobiles for sale by automobile dealers and individuals, for a fee, as well as advertisements for automobile dealers in general. Plaintiff B&Z owns and operates three (3) automobile dealerships in the New York Metropolitan area, all of which have paid, collectively, millions of dollars in subscription fees to Autotrader to advertise their vehicles for sale. Plaintiff was induced by Autotrader to pay subscription fees based upon certain representations made by Autotrader and its agents as to the advertising reach that Plaintiff would supposedly achieve, and was purportedly receiving, by utilizing Autotrader's web marketing services.

The manner in which dealers advertise and sell automobiles and trucks has changed dramatically in recent years.  In the past, consumers were led to dealers by physically visiting their local dealerships and inquiring about vehicles or by viewing printed advertisements placed by dealerships that featured a limited sample of the vehicles the dealers had for sale, and at what terms. Consumers had little ability to easily compare vehicles and prices as between different dealers. The internet eventually provided consumers with the ability to access extensive information about different dealers' vehicles available for sale, and at what prices and terms. As a result, now a significant percentage of new and used vehicle purchases begin with online searches by consumers and, thus, dealers have had to adapt their marketing and advertising accordingly.

To appeal to online shoppers, most automobile dealerships set up their own websites for advertising and promotional purposes. In addition, some dealers go one step further, and use premium third-party websites such as Autotrader.com, Cars.com, Truecar.com, and many other online advertising providers, which allow dealers to post their vehicle inventory online in ways

that resemble their traditional television commercials and print advertisements, but with functionality such that consumers can search for particular types of vehicles offered for sale by dealers and compare the vehicles' options, pricing, and other material details. Consumers who enter a search for a particular type of vehicle receive a list of vehicles and dealers to compare and choose from. Some dealers expend significant sums of money to these internet advertisers, such as Autotrader in hopes of driving consumer traffic to their dealerships. Most internet advertisers, such as Autotrader, offer consumers free access to their website to search for vehicles, and they derive their revenue substantially from dealers that place advertisements for their dealership on the websites and pay for the right to post individual vehicles for sale on the websites.

Autotrader, through its advertising and promotional activities, targets automobile dealers in a number of ways, including personal sales calls by sales representatives, providing printed advertising and marketing materials, e-mailing advertising and marketing materials, and by other means. In particular, Autotrader's marketing and advertising communications emphasize, as their main selling point to dealers, a number of statistical metrics that are designed to convey the purported efficacy and benefits of the online advertising that Autotrader offers. However, the "advertising reach" statistics that Autotrader used to induce Plaintiff B&Z and other dealers to purchase its online advertising services were in fact inaccurate and misleading.

Defendant Autotrader, among other false statements in its sales, marketing and advertising communications, falsely inflated, by as much as one hundred percent (100%), the number of "search results pages" (or "SRPs") and the number of "vehicle detail pages" (or "VDPs") that its website was actually providing to the Plaintiff.[1] Moreover, evidence establishes

---

[1]  A comparable metric is commonly used throughout  the internet industry in setting internet advertising rates is typically referred to as "page views" and "click throughs," respectively.

that Autotrader knowingly and intentionally concealed, actively and by omission, the fact that it was providing inaccurate SRP and VDP data to automobile dealers, including the Plaintiff. Autotrader's intent in providing inflated SRP and VDP statistics was to fraudulently induce automobile dealers, including Plaintiff, to purchase internet advertising packages from Autotrader, to purchase upgrades or premium services, or simply to remain as Autotrader customers instead of pursuing alternative sources of advertising.

Defendant Autotrader's misrepresentations of the statistical effectiveness of its advertising results have caused substantial economic losses to Plaintiff B&Z. Autotrader's misrepresentations made by electronic means constituted wire fraud in violation of 18 U.S.C. § 1343 and were (a) committed as part of a pattern of racketeering activity in violation of the RICO Act (18 U.S.C. § 1961 et seq.); (b) constituted deceptive acts in violation of the New York Deceptive Acts and Practices Act (N.Y. Gen. Bus. Law §349); and (c) constituted false advertising in violation of the New York Deceptive Acts and Practices Act (N.Y. Gen. Bus. Law § 350). In addition, Defendant is liable to Plaintiff for its misrepresentations under New York's common law doctrines of breach of contract, fraud and negligent misrepresentation, and under the equitable doctrine of unjust enrichment.

## THE PARTIES

1.     Plaintiff B&Z is a corporation organized and existing under the laws of the State of New York with its principal place of business located at 5869 Broadway, Bronx New York, and is engaged in the business of buying and selling autos and trucks.

2.     Plaintiff B&Z does business under the trade name "Riverdale Chrysler Jeep" at 5869 Broadway, Bronx New York.

3.      Plaintiff B&Z does business under the trade name "Eastchester Chrysler Jeep Dodge" at 4007 Boston Road, Bronx, New York.

4.      Plaintiff B&Z did business under the trade name "New York Cars Direct" at 2020 Boston Post Road, Larchmont, New York.

5.      Plaintiff B&Z dis business under the trade name "New York Autos Direct" at 2020 Boston Post Road, Larchmont, New York.

6.      Defendant Autotrader is a corporation organized and existing under the laws of the State of Delaware, and is authorized to business in New York by the New York Department of State, with its principal place of business designated as Suffolk County, New York.

## JURISDICTION AND VENUE

7.      This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1331, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

8.      This Court has personal jurisdiction over Defendant Autotrader by virtue of its transacting and doing business in this District and pursuant to N.Y. C.P.L.R. § 302(a). Autotrader has transacted and done business in the State of New York and in this District and has disseminated its false advertising and information in the State of New York and in this District.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant is a corporation subject to personal jurisdiction in this District and has designated its domicile and principal place of business in New York to be in this District.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this District, including Autotrader's dissemination of false advertising and its communication of false information in this District.

## FACTS COMMON TO ALL COUNTS

11.     Defendant Autotrader owns and operates an online advertising service that charges motor vehicle dealers for the right to list individual vehicles for sale on its website under the domain name "www.autotrader.com" ("the website").

12.     Prospective vehicle purchasers (or "consumers") are permitted free access to the website.

13.     Prospective vehicle purchasers specify certain parameters by which the website's software conducts a search of the database of vehicles listed for sale by Autotrader's customers.

14.     The search parameters that prospective purchasers may choose include, but are not limited to, the year, make, model and trim of the vehicle sought, as well as the geographic location of the dealers and/or sellers of such vehicles.

15.     The website's software then returns search results to consumers in the form of a list showing all vehicles for sale within its database that meet the consumers' search parameters.

16.     Autotrader utilizes a certain metric to keep track of the number of times a particular dealer's vehicles are included in consumers' vehicle search results.

17.      Autotrader refers to each incident in which a dealer's vehicle appears in a consumer's search results as a "Search Results Page" (hereinafter, "SRP").

6

18.     Upon information and belief, Autotrader only counts a vehicle appearing in search results as an SRP if the actual page on which the vehicle is listed is viewed by the consumer.

19.     Upon information and belief, Autotrader does not count as an SRP instances in which a vehicle appears in search results if, for example, a vehicle is listed on the page three of the search results, but the consumer only clicks through to page two of the search results.

20.     Autotrader, in its marketing, advertising and direct sales presentations to prospective dealer customers, as well as in its performance reports to existing dealer customers, touts the SRP metric as the key indicator of the value that dealers receive for purchasing Autotrader's advertising packages.

21.     Autotrader, in its marketing and advertising materials, in its direct sales presentations to prospective dealer customers, and in its performance reports to existing dealer customers, draws an analogy between the number of times a dealer's vehicles appear in search results pages (i.e., its SRP's) and the number of times customers would have physically visited the dealership under the old "brick and mortar" era.

22.     Autotrader also utilizes a performance metric known as "Vehicle Detail Pages (also referred to as "VDP's).

23.     Autotrader defines a "VDP" as the number of times consumers actually "click" on a particular vehicle that appears in vehicle search results in order to view all of the details of the vehicle, including options, pricing, terms, photographs, etc. In the internet industry, this metric is analogous to the "click through" rate.

24.     The VDP's counted for a particular dealer are, naturally, a subset of its SRP's, because not every vehicle that appears in a search results page will be "clicked" by the consumer such that the consumer can view that vehicle in detail.

25.     Autotrader, in its marketing and advertising materials, in its direct sales presentations to prospective dealer customers, and in its performance reports to existing dealer customers, draws an analogy between the number of times a dealer's vehicles are viewed in detail (i.e., its VDP's) and the number of times customers would have physically visited the dealership and inquired about a specific vehicle for sale in the old "brick and mortar" era.

26.     Autotrader also offers dealers a premium add-on service known as "spotlighting."

27.     Autotrader claims, and specifically represents to dealers, including the Plaintiff, that "spotlighting" ensures that a dealer's vehicle that meet the consumer's search parameters will appear at the top of the first page of the search results, resulting in higher SRPs, because the consumer automatically sees at least the first page of the search results.

28.     In or about May 2010, Autotrader's sales representative solicited B&Z Auto to become an online advertiser on Autotrader's website.

29.     Autotrader's representative provided written marketing materials, both printed and electronic, to B&Z Auto in conjunction with its attempt to sell its services to B&Z Auto.

30.     Autotrader's representative also met with representatives of B&Z Auto to discuss Autotrader's online advertising services and to attempt to induce B&Z Auto to utilize those services.

31.     The marketing materials that Autotrader provided to B&Z Auto, both via e-mail and in printed form, explained the concept behind Autotrader's SRP and VDP metrics, and emphasized the analogy between SRPs equating to consumer visits to the dealership and VDPs being tantamount to consumer inquiries about a specific vehicle for sale.

32.     Autotrader's representative also verbally explained to B&Z Auto's representative Autotrader's SRP and VDP metrics, and how those statistics measured and reflected the benefits to dealers of using Autotrader's services.

33.     Autotrader's representative, verbally, and in written documents provided to B&Z Auto, both electronically via e-mail and in printed form, offered specific examples of existing dealers' SRP and VDP results, including specific monthly SRPs and VDPs achieved by other dealers.

34.     Upon information and belief, the SRPs and VDPs purportedly being achieved by other dealers, which were communicated by Autotrader's representative to B&Z Auto were, in fact, inflated by between 50% and 100% (or more).

35.     In or about June 2010, B&Z Auto, in reliance upon the aforesaid false and misleading representations of Autotrader's representatives as to the advertising reach enjoyed by other dealers, and thus anticipating the advertising reach that it could itself achieve through Autotrader's platform, B&Z Auto decided to enroll in Autotrader's online advertising program on a month-to-month basis.

36.     Autotrader sold B&Z Auto a monthly online advertising package that entitled B&Z Auto to list a certain number of vehicles for sale on Autotrader's website.

37.     At no time since B&Z Auto began utilizing Autotrader's advertising program in June 2010 and continuing until B&Z Auto terminated its relationship with Autotrader in September 2015 has B&Z Auto ever entered into a long term online advertising contract with Autotrader.

38.     At all times during its business relationship with Autotrader, B&Z had the right to terminate, or not renew, its month-to-month contract.

39.     On or about July 4, 2010, shortly after the conclusion of B&Z Auto's first month of advertising on Autotrader's online platform, Autotrader communicated to B&Z Auto what Autotrader claimed to be accurate metrics reflecting the advertising reach that B&Z Auto had purportedly achieved through Autotrader's online platform in the preceding month.

40.     That communication of B&Z Auto's advertising reach results was in the form of a report created by Autotrader called a "Dealer Scorecard," as well as a spreadsheet referred to as a "Performance Tracker," which compared the current month's SRPs and VDPs to those of prior months.

41.     The aforesaid communication from Autotrader to B&Z Auto was transmitted by Autotrader via electronic mail addressed to B&Z Auto's principal.

42.     Upon information and belief, the number of "search results pages" (SRPs) achieved by B&Z Auto during that first month, and every month thereafter, as reported in Autotrader's Dealer Scorecards, was inflated by 50% to 100% or more above the number of SRP's that B&Z Auto had actually achieved.

43.     Upon information and belief, the number of "vehicle detail pages" (VDPs) achieved by B&Z Auto during that first month, and every month thereafter, as reported in Autotrader's Dealer Scorecards, was inflated by between 50% and 100% above the number of VDP's that B&Z Auto had actually received.

44.     Upon information and belief, Autotrader's website was programmed by Autotrader such that its "counting" software "double-counted" the number of search results pages viewed by consumers.

45.     Upon information and belief, Autotrader's website was programmed by Autotrader such that its "counting" software "double-counted" the number of vehicle search results pages (SRPs) viewed by consumers for certain types of search inquiries.

46.     Upon information and belief, Autotrader's website was programmed by Autotrader such that its "counting" software "double-counted" the number of vehicle detail pages (VDPs) viewed by consumers for certain types of "click throughs."

47.     Upon information and belief, Autotrader knowingly and intentionally programmed its "counting" software to inflate the number of SRPs and VDPs recorded for its customers, including B&Z Auto.

48.     Upon information and belief, Autotrader had actual notice that its "counting" software inflated the number of SRPs and VDPs recorded for its customers, including B&Z Auto.

49.     Autotrader should have known, upon the exercise of reasonable diligence, that its "counting" software inflated the number of SRPs and VDPs recorded for its customers, including B&Z Auto.

50.     Despite Autotrader's knowledge that its "counting" software inflated the number of SRPs and VDPs recorded for its customers, including B&Z Auto, upon information and belief Autotrader used that inaccurate and misleading SRP and VDP data as the basis for its monthly "Dealer Scorecard" reports to B&Z Auto and other customers between June 2010 and June 2015.

51.     Autotrader's primary intent in communicating the aforesaid misleading and inaccurate monthly SRP and VDP results to B&Z Auto and other customers was to ensure that B&Z Auto would continue utilizing and paying for Autotrader's internet advertising services.

52.     Autotrader's secondary intent in communicating the aforesaid misleading and inaccurate monthly SRP and VDP results to B&Z Auto and other customers was to induce B&Z Auto to purchase additional "premium" utilities above its base internet advertising subscription, such as "spotlighting," and to continue utilizing and paying for those premium utilities after they were initially added to B&Z Auto's account.

53.     B&Z Auto remained a user of Autotrader's online advertising platform from June 2010 until B&Z Auto terminated its account September 1, 2015.

54.     On or about the 4th day of every month from July 4, 2010 and September 4, 2015, Autotrader continued to send, via mail and e-mail, in substantially the same form, monthly "Dealer Scorecards" and/or "Performance Tracker Reports" to B&Z Auto.

55.     Upon information and belief, each of the approximately forty-eight (48) monthly Dealer Scorecards and/or "Performance Tracker Reports" sent by Autotrader to B&Z Auto between July 1, 2010 and June 5, 2015 contained the previously described misrepresentations as to the number of SRPs and VDPs that Autotrader was providing to B&Z Auto.

56.     Upon information and belief, in or around December 2014 an information and technology employee of Autotrader and/or an outside consultant hired by Autotrader, or both, specifically notified Autotrader's management and staff that its "counting" software was double counting certain SRPs and VDPs for its dealer customers, which included B&Z Auto.

57.     Despite being put on notice that its software was over counting B&Z Auto's and other dealers' SRPs and VDPs, and thus that Autotrader had been communicating false and inaccurate advertising results to B&Z Auto for the prior 4 ½ years, Autotrader did not alert or notify its customers, including B&Z Auto, of those facts.

58.     In fact, Autotrader thereafter continued to communicate the false and inaccurate monthly Dealer Scorecards to B&Z Auto and its other dealer customers.

59.     Upon information and belief, at some time between December 2014 and May 2015 Autotrader caused, or attempted to cause, its "counting" software to be reprogrammed such that it no longer double-counted certain SRPs and/or VDPs.

60.     However, even during that time period Autotrader continued to disseminate, via e-mail, the false and misleading Dealer Scorecards to B&Z Auto and other dealer customers.

61.     In early July 2015, when B&Z Auto's principal received the Dealer Scorecard for June 2014 via e-mail from Autotrader, B&Z Auto's principal observed a precipitous decline of at

least 50% in its SRPs from the same month of the previous year, as well as a significant decline from the prior months, despite having a similar number of similar vehicles listed for sale on Autotrader's platform.

62.     Unbeknownst to B&Z Auto's management and its principal owner, the severe decline in B&Z Auto's advertising reach in June 2015, at least as reflected in the SRPs that Autotrader reported, was, upon information and belief, a result of the reprogramming of Autotrader's counting software in or about May 2015 such that the software was no longer double counting certain search results.

63.     B&Z Auto's principal's subsequent investigation of this seemingly inexplicable decline in SRP results revealed information indicating the aforementioned facts that IT consultants had flagged Autotrader's counting software to have been inaccurate, in or about December 2014; that apparently in or about May 2015 Autotrader had caused the software to be reprogrammed; and that at no time had Autotrader given notice to its customers, including B&Z Auto, that Autotrader had been communicating false and misleading advertising reach and effectiveness statistics to its customers, including B&Z Auto, for months and/or years.

64.     In July 2015 B&Z Auto's principal communicated his intent to terminate B&Z's relationship with Autotrader unless a plausible explanation was provided for the sudden reduction by approximately 50% of the advertising reach that Autotrader was supposedly providing to B&Z Auto prior to June 2015.

65.     In response, instead of finally admitting to B&Z Auto that it had been over counting, and misrepresenting to B&Z, its advertising reach, and instead of advising B&Z of the fact that the decrease in its June 2015 SRPs was due to the software reprogramming that was

finally recording the accurate number of SRPs, Autotrader's representatives intentionally concocted and communicated to B&Z a series of false and misleading explanations.

66.     On several occasions in July and August 2015, Autotrader sent mid-level and high-level executives to meet with B&Z Auto in an attempt to prevent B&Z Auto from terminating its Autotrader account, because B&Z Auto's was a large account inasmuch as B&Z Auto was paying Autotrader in excess of $16,000.00 per month to advertise B&Z's dealerships.

67.     On each such occasion, Autotrader's representatives proffered intentionally false and misleading explanations for the sudden and substantial decline in reported SRPs beginning in June 2015.

68.      For example, in August 28, 2015, an Autotrader executive based in New Jersey traveled to B&Z Auto's dealership to meet with B&Z Auto's principal, in an attempt to persuade B&Z Auto not to terminate its relationship with Autotrader.

69.     At that meeting, Autotrader's executive ("J.C.") communicated a series of factually inaccurate and misleading excuses for the sudden decline in B&Z Auto's SRPs beginning in June 2015, none of which excuses included the truth, which was that Autotrader's software had over counted the SRPs, which were then reported to B&Z Auto.

70.     For example, J.C. attempted to lay the blame for B&Z Auto's significant decline in SRPs on the false premises that B&Z Auto had recently begun listing different types of vehicles for sale and, alternatively or conjunctively, that B&Z Auto had changed its pricing and other terms to be less attractive to consumers, and thus its vehicles were being returned in search results less often.

71.     At no time did Autotrader's executive J.C. mention the fact that Autotrader's software had been over counting SRPs, that the software had been reprogrammed, or that Autotrader had been reporting inaccurate SRPs to B&Z Auto prior to June 2015; in fact, the executive denied that any of those accusations were accurate.

72.     Upon information and belief, J.C. knew that those statements made by him during the August 28, 2015 meeting were false and misleading.

73.     Autotrader's executive J.C. followed up that "business retention" sales meeting with B&Z Auto by sending an e-mail to B&Z Auto's principal on August 29 2015, in which J.C. reiterated the false explanations for the sudden decline in B&Z Auto's reported SRPs, and in which J.C. made no mention of the actual reasons previously described herein, in effect the fact that Autotrader's software was improperly programmed.

74.     Upon information and belief, J.C. knew that the statements made by him in his e-mail of August 29, 2015 regarding the purported reasons for the sudden decline in B&Z Auto's SRPs and VDPs were false, as did the other Autotrader representatives that met with B&Z Auto's principal after July 1, 2015 and offered false explanations for the data discrepancy.

75.     At all times herein mentioned, Autotrader's managers, sales personnel, executives and employees acted within the scope of their employment by Autotrader, and in furtherance of their employment.

76.     On or about September 1, 2015, B&Z Auto terminated its online advertising agreement with Autotrader, based upon Autotrader's continued misrepresentations to B&Z Auto

over a period of more than five years, and based upon the fact that Autotrader was not providing, and could not provide, the advertising reach that it had represented to B&Z Auto.

77.     At all relevant times, defendant Autotrader carried out the foregoing scheme to deceive plaintiff B&Z Auto knowingly, willfully, and with the specific intent to defraud B&Z Auto by inducing B&Z Auto to enter into the online advertising agreement and, thereafter, to refrain from terminating or failing to renew that agreement.

78.     At all relevant times, B&Z Auto was justified in relying upon Autotrader's representations as to the effective reach of the advertising that Autotrader would provide and was providing, and B&Z actually did rely upon Autotrader's misrepresentations in deciding to enter into the online advertising agreement and, thereafter, to refrain from terminating or failing to renew that agreement.

79.     But for Autotrader's misrepresentations about the effectiveness of its advertising services, B&Z Auto would not have entered into the online advertising agreement in the first instance and, thereafter, if not for each succeeding misrepresentation by Autotrader B&Z would have immediately terminated or failed to renew that agreement.

80.     During the course of B&Z Auto's business relationship with Autotrader, and having been induced to enter into and remain in that relationship by Autotrader's continual misrepresentations, B&Z Auto paid to Autotrader the total sum of at least $1,487,136.00.

## COUNT I – CONSPIRACY TO VIOLATE RICO
### (18 U.S.C. § 1962)

81.    Plaintiffs repeat and re-allege the allegations of Paragraphs 1-80 as if fully set forth herein.

82.    This count is brought by the Plaintiff B&Z Auto against Defendant Autotrader alleging a cause of action under 18 U.S.C. § 1962(d), for conspiring to violate 18 U.S.C. § 1962(c).

83.    At all relevant times, the Plaintiff and Defendant were "persons" pursuant to § 1961(3).

84.    At all relevant times, Autotrader, a corporation, was an "enterprise" pursuant to § 1961(4).

85.    All of the aforementioned e-mails, telephone calls, faxed communications, and internet postings on the set forth above were made in furtherance of Autotrader's scheme to defraud B&Z Auto, and to subsequently cover-up the fraud scheme when Autotrader attempted to investigate the data discrepancies.

86.    Therefore all of the foregoing communications were made in violation of the mail and wire fraud statutes.

87.    The plaintiffs were defrauded by one or more of the described mail and wire communications.

88.    Autotrader's pattern of mail and interstate wire communications occurred over a period of approximately sixty-two (62) months, from the time that B&Z Auto was induced to

contract for services with Autotrader in June 2010 until B&Z Auto discovered the fraudulent scheme and terminated the contract in September 2015.

89.     Autotrader's fraud scheme and cover-up victimized many persons in addition to the plaintiff herein.

90.     Thus, Plaintiff asserts claims against the Defendant for conspiring to violate § 1962(c), which prohibits any person employed by or associated with an enterprise from participating in the affairs of the enterprise through a pattern of racketeering activity.

91.     This conspiracy to violate § 1962(c) is a violation of § 1962(d).

## COUNT II – CONDUCT AND PARTICIPATION IN A RICO ENTERPRISE THROUGH A PATTERN OF RACKETEERING ACTIVITY (18 U.S.C. §§ 1961(5) AND 1962(C))

92.     Plaintiff repeats and re-alleges the allegations of Paragraphs 1-90 as if fully set forth herein.

### Predicate Criminal Violations of Federal Mail Fraud Statute (18 U.S.C. § 1341)

93.     The Defendant and its agents could be charged and convicted of multiple, related violations of law which form a pattern and practice and which violations are each potentially punishable by more than one year in jail, constituting mail fraud.

94.     Defendants acted in criminal violation of the federal mail fraud statute under 18 U.S.C. § 1341.

95.     18 U.S.C. § 1341 provides that:

"a. Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent

pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both."

96.     Defendant, through its agents, utilized false or fraudulent pretenses, representations, and/or promises in order to defraud and/or obtain money from B&Z Auto in the form of payments for online advertising services.

97.     In order to achieve or attempt to achieve the fraud described in the preceding paragraphs, Defendant sent correspondence and other documents that were sent or delivered by the Postal Service and by electronic wire, including but not limited to the previously described Dealer Scorecards and Dealer Performance Reports.

**Predicate Criminal Violations of Federal Wire Fraud Statute (18 U.S.C. § 1343)**

98.     The Defendant and its agents could be charged and convicted of multiple, related violations of law which form a pattern and practice and which violations are each potentially punishable by more than one year in jail constituting wire fraud.

99.     The Defendant further acted in criminal violation of the federal wire fraud statute under 18 U.S.C. 1343.

100.     18 U.S.C. § 1343 provides that:

a. Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

101. Defendant Autotrader devised or intended to devise a scheme or artifice meant to defraud and/or to obtain money or property from Plaintiff B&Z Auto, in the form of payments for online advertising services.

102. Defendant transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice when they transmitted telephone and cellular telephone calls, documents, facsimiles, emails, instant messages, and other forms of communications, in violation of 8 U.S.C. § 1343.

103. At the various times and places partially enumerated herein, Defendant Autotrader did, through the actions of its officers, employees and agents, associate in a RICO enterprise whose activities did affect, interstate and foreign commerce.

104. Defendant, through its officers and employees, did conduct and/or participate, either directly or indirectly, the affairs of said RICO enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c)

105. By virtue of the predicate acts described in this Complaint, including without limitation, Defendant Autotrader's repeated and continuous acts of mail fraud and wire fraud, Defendant transferred, received, and furthered the generation of income that was derived, both

directly and indirectly, from a pattern of racketeering activity in which Defendant Autotrader participated along with its agents, officers and employees.

106.    The Defendant and its officers and employees participated as principals in the enterprise, and used and invested, both directly and indirectly, such income from the enterprise and the proceeds of such income, in establishing, operating and furthering the illegal enterprise in violation of 18 U.S.C § 1962(a).

107.    Plaintiff further alleges that the Defendant did commit two (2) or more of the offenses itemized above in a manner which its officers and employees calculated and premeditated intentionally to enable the continuity of the racketeering enterprise, also in violation of the RICO law at 18 U.S.C. § 1962(b).

108.    As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(a), Plaintiff suffered the loss of valuable property, financial services and support, and suffered other business and pecuniary damages.

109.    Plaintiff demands that judgment be entered against the Defendant, including an award of trebled damages, pursuant to 18 U.S.C. § 1964(c), compensatory and actual damages, reasonable attorneys' fees, pre-judgment interest, post-judgment interest, costs, and any other relief that this Court deems just and proper.

## COUNT III – DECEPTIVE ACTS AND PRACTICES
## UNDER NEW YORK GENERAL BUSINESS LAW § 349

110.    Plaintiff repeats and re-alleges the allegations of Paragraphs 1-80 as if fully set forth herein.

111.     As its third ground for relief, Plaintiff claims that Defendant committed deceptive acts and practices and false advertising under New York General Business Law § 349.

112.     Autotrader has at all material times furnished its services in the State of New York.

113.     Autotrader has made, and is continuing to make, false, deceptive and misleading descriptions and representations of fact in its communications to existing and prospective automotive dealers in general, and to B&Z Auto in particular.

114.     New York General Business Law § 349 prohibits any business such as Autotrader from engaging in deceptive acts or practices, whether such acts would or would not constitute violations of any statute or regulation of the State of New York.

115.     As described supra, Defendant Autotrader, between June 2010 and September 1, 2015, provided and furnished to Plaintiff B&Z Auto, on at least a monthly basis, documents that misrepresented the extent of advertising reach Autotrader's website would provide, and was providing, to B&Z Auto, for the purpose of, initially, inducing B&Z Auto to become an Autotrader client and, subsequently, to remain a client.

116.     In addition, Defendant Autotrader, by its agents, between June 2010 and September 1, 2015, communicated verbally with Plaintiff B&Z Auto's agents, on at least a monthly basis, which communications misrepresented the extent of advertising reach Autotrader's website would provide, and was providing, to B&Z Auto, for the purpose of, initially, inducing B&Z Auto to become an Autotrader client and, subsequently, to remain a client.

117.    Beginning on or about July 5, 2015 and continuing to the present, Defendant Autotrader, by its agents, have communicated, verbally and via e-mail, with Plaintiff B&Z Auto's agents, material misrepresentations as to the reasons that B&Z Auto's SRPs experienced a decline of approximately fifty percent (50%) beginning in June 2015, with the intention of concealing Autotrader's prior misrepresentations of B&Z Auto's advertising reach and with the intention of retaining B&Z Auto as a paying customer by concealing the true facts from B&Z Auto.

118.    Each of the foregoing instances of misrepresentation constituted a separate "deceptive act or practice" for the purposes of New York General Business Law § 349.

119.    These violations have injured Plaintiff B&Z Auto in its business, and induced the Plaintiff to pay to the Defendant at least one million four hundred thousand dollars ($1,487,136.00) during the course of Plaintiff's and Defendant's business agreement.

120.    Pursuant to New York General Business Law § 349(h), Plaintiff is entitled to an award of damages in the amount of one thousand dollars ($1,000.00) for each deceptive act committed by the Defendant, as describe herein.

121.    By reason of the foregoing, Plaintiff is entitled to recover damages, punitive damages and its reasonable attorneys' fees, in an amount to be determined at trial.

### COUNT IV – FALSE ADVERTISING UNDER NEW YORK GENERAL BUSINESS LAW § 350-a

122.    Plaintiff repeats and re-alleges the allegations of Paragraphs 1-80 as if fully set forth herein.

123.    As its fourth ground for relief, Plaintiff claims that Defendant engaged in false advertising as defined under New York General Business Law § 350-a.

124.    Autotrader at all material times furnished its services in the State of New York.

125.    Autotrader has engaged in false advertising to existing and prospective automotive dealer customers in general, and to B&Z Auto in particular.

126.    New York General Business Law § 350-a prohibits any business such as Autotrader from engaging in false advertising, which includes the dissemination of information that is incorrect, misleading, or fails to reveal material facts about the business or the products and services that the business offers.

127.    As described supra, Defendant Autotrader, between June 2010 and September 1, 2015, provided and furnished to Plaintiff B&Z Auto, on at least a monthly basis, documents that misrepresented the extent of the advertising reach that Autotrader's website would provide, and was providing, to B&Z Auto, for the purpose of, initially, inducing B&Z Auto to become an Autotrader client and, subsequently, to remain a client.

128.    In addition, Defendant Autotrader, by its agents, between June 2010 and September 1, 2015, communicated verbally with Plaintiff B&Z Auto's agents, on at least a monthly basis, which communications misrepresented the extent of advertising reach Autotrader's website would provide, and was providing, to B&Z Auto, for the purpose of, inducing B&Z Auto to become an Autotrader client and, subsequently, to remain a client.

129.    Moreover, beginning on or about July 5, 2015 and continuing to the present, Defendant Autotrader, by its agents, have communicated, verbally and via e-mail, with Plaintiff

B&Z Auto's agents, material misrepresentations as to the reasons that B&Z Auto's SRPs experienced a decline of approximately fifty percent (50%) beginning in June 2015, with the intention of concealing Autotrader's prior misrepresentations of B&Z Auto's advertising reach and with the intention of retaining B&Z Auto as a paying customer by concealing the true facts from B&Z Auto.

130.    Each of the foregoing instances of misrepresentation constituted a separate act of "false advertising" for the purposes of New York General Business Law § 350-a.

131.    The foregoing violations have injured Plaintiff B&Z Auto in its business, and fraudulently induced the Plaintiff to pay to the Defendant at least one million four hundred thousand dollars ($1,487,136.00) during the course of Plaintiff's and Defendant's business agreement.

132.    Pursuant to New York General Business Law § 349(h), Plaintiff is entitled to an award of treble damages in the amount of one thousand dollars ($1,000.00) for each act of false advertising committed by the Defendant, as describe herein.

133.    By reason of the foregoing, Plaintiff is entitled to recover damages, treble damages and its reasonable attorneys' fees, in an amount to be determined at trial.

## COUNT V – BREACH OF CONTRACT

134.    Plaintiff repeats and re-alleges the allegations of Paragraphs 1-80 as if fully set forth herein.

135.    There existed an agreement between Plaintiff and Defendant for Plaintiff to pay Defendant in exchange for the described online advertising services, which agreement did

constitute a valid and enforceable contract between Plaintiff and Defendant, which was terminable at will, or on a monthly basis.

136.    Plaintiff has duly performed all of its obligations pursuant to the agreement between itself and the Defendant.

137.    Pursuant to the agreement, Autotrader expressly promised that the advertising reach, i.e., the SRPs and VDPs, that Autotrader would provide to B&Z Auto through its website was consistent with the performance data that Defendant was communicating to the Plaintiff on an ongoing basis.

138.    Autotrader's representations as to the SRPs and VDPs that B&Z Auto would experience, and was supposedly receiving, was an integral part of the basis of the bargain between the parties.

139.    Defendant Autotrader has materially breached its agreement with Plaintiff B&Z Auto by failing to provide the advertising reach and effectiveness that Autotrader promised to provide to B&Z Auto.

140.    Plaintiff B&Z has suffered direct, general damages, as well as special, consequential damages, as a result of the Defendant Autotrader's breach of contract.

141.    As a proximate result of the Defendant's breach of its contractual duties and obligations, Plaintiff has been damaged in an amount to be proven at trial and estimated to equal or exceed one million four hundred eighty-seven thousand dollars ($1,487,136.00), plus pre-judgment interest.

## COUNT VI – BREACH OF THE COVENANT OF GOOD FAITH
## AND FAIR DEALING

142.   Plaintiff repeats, reiterates and realleges each of the allegations contained in paragraphs 1 through 80 and 135 through 139 as if set forth more fully and at length herein.

143.   The agreement between the parties, like all contracts subject to New York law, contains an implied covenant of good faith and fair dealing.

144.   By their conduct alleged herein, the Autotrader, through its agents and employees, has breached the implied covenant of fair dealing.

145.   Autotrader, through its agents and employees, has acted to deny B&Z Auto the reasonably expected benefits that Plaintiff bargained for in entering into the online advertising agreement.

146.   As a result of the Defendant's bad faith conduct and wrongful acts as set forth above, the Defendant has breached the covenant of good faith and fair dealing implied in all contracts in the State of New York.

147.   As a result of the Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff has sustained substantial damages in an amount to be determined at trial and estimated to equal or exceed $1,487,136.00.

## COUNT VII – UNJUST ENRICHMENT

148.   Plaintiff repeats, reiterates and realleges each of the allegations contained in paragraphs 1 through 80 supra as though fully pleaded herein.

149.    By reason of the facts alleged herein, Defendant Autotrader has been unjustly enriched by retaining the sums of money paid by Plaintiff B&Z Auto for online advertising services, which sums greatly exceeded the fair market value of the services that Autotrader provided.

150.    Defendant Autotrader's enrichment is unjust and comes at the expense of the Plaintiff B&Z Auto.

151.    It is against equity and good conscience to permit Autotrader to retain what it has unjustly procured.

152.    As a result thereof, Plaintiffs have sustained substantial damages in equity in an amount to be determined at trial and estimated to equal or exceed $1,487,136.00.

## COUNT VIII – FRAUDULENT INDUCEMENT

153.    Plaintiff repeats, reiterates and re-alleges each of the allegations contained in paragraphs 1 through 80 as if set forth more fully and at length herein.

154.    In deciding to purchase the Defendant Autotrader's online advertising services, and in refraining from terminating or not renewing the online advertising agreement on an ongoing basis, Plaintiff B&Z Auto reasonably relied upon the promises, representations and warranties of Autotrader as to the advertising reach that B&Z Auto would enjoy, and that B&Z Auto was in fact receiving.

155.    The Defendant's representations, however, were materially false and misleading in that, among other things, the number of SRPs and VDPs that Autotrader represented were

being achieved by similar dealers were, in fact, inflated by between fifty percent (50%) and one hundred percent (100%) or more.

156.    The Defendant's representations were also materially false and misleading in that, among other things, the number of SRPs and VDPs that Autotrader represented were being achieved by B&Z Auto were, in fact, inflated by between fifty percent (50%) and one hundred percent (100%) or more.

157.    The Defendant's representations were also materially false and misleading in that even after Autotrader had been put on notice of its own misrepresentations regarding B&Z Auto's SRPs and VDPs, and even after Autotrader had reprogrammed its counting software, Autotrader continued to actively mislead B&Z Auto as to the real reason that B&Z Auto's advertising reach metrics had suddenly declined beginning in June 2015.

158.    In addition, even after Autotrader had been put on notice of its own misrepresentations regarding B&Z Auto's SRPs and VDPs, and even after Autotrader had reprogrammed its counting software, Autotrader continued to mislead B&Z Auto by omitting from its communications with B&Z Auto the real reason that B&Z Auto's advertising reach metrics had suddenly declined beginning in June 2015.

159.    The Defendant made the foregoing false representations, and concealed material facts, with the intent of inducing Plaintiff to rely to its detriment upon those false statements of fact and omissions of fact by obligating itself to the ongoing purchase of Defendant's online advertising services.

160.   Plaintiff did in fact rely, reasonably and to its detriment, upon the foregoing material misrepresentation and omissions of the Defendant.

161.   Upon information and belief, the Defendant's fraud as described was also carried out as against many or all of its other automotive dealer customers, which constituted a harm to the general public and to the automotive and online advertising markets.

162.   By reason of the foregoing, the Defendant committed fraud in the inducement, and Plaintiff has been injured in an amount to be determined at trial, but which is believed to be in excess of $1,487,136.00, plus interest, plus an additional sum for exemplary and punitive damages in an amount to be determined at trial.

## COUNT IX – NEGLIGENT MISREPRESENTATION

163.   Plaintiff repeats, reiterates and re-alleges each of the allegations contained in paragraphs 1 through 80 as if set forth more fully and at length herein.

164.   The relationship between Plaintiff B&Z Auto and the Defendant Autotrader constituted a special relationship of trust or confidence, which created a duty on the part of the Defendant to impart accurate information to Plaintiff.

165.   The Defendant at all relevant times knew or should have known that its software was inflating the number of SRPs and VDPs that were being achieved by its dealer customers, including the Plaintiff.

166.   The Defendant at all relevant times knew or should have known that the reports that it provided to the Plaintiff stated inflated, inaccurate numbers of SRPs and VDPs being achieved by its dealer customers, including the Plaintiff.

167.    The Defendant's aforesaid statements were false or incorrect and were made negligently and/or recklessly, under the circumstances.

168.    The Plaintiff reasonably relied upon the Defendant's statements in deciding to initially purchase Defendant's online advertising services, as well as to remain an Autotrader client throughout the course of their relationship.

169.    By reason of the foregoing, Plaintiff has been injured in an amount to be determined at trial, but which is believed to be in excess of $1,487,136.00, plus interest.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury on all claims as to which a jury trial is permitted.

BELLAVIA BLATT & CROSSETT, PC

By:    /s/    _____

Leonard A. Bellavia  (lbellavia@dealerlaw.com)
Shaun M. Malone (smalone@dealerlaw.com)
200 Old Country Road, Suite 400
Mineola, NY 11501
(516) 873-3000

*Attorneys for Plaintiff B&Z Auto*